### In re ASBESTOS CASES
### No. CP–77–1.

United States District Court,
E. D. Virginia,
Norfolk and Newport News Divisions.

May 6, 1981.

Robert C. Nusbaum, Hofheimer, Nusbaum, McPhaul & Brenner, Norfolk, Va., for Greitzer & Locks, Gene Locks, Martin Greitzer, and Neil R. Peterson.

C. Michael Montgomery, Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., for Johns-Manville Corp.; Johns-Manville Sales Corp.

William V. Hoyle, Hoyle, Corbett, Hubbard, Smith & Payne, Newport News, Va., for Raybestos-Manhattan, Inc.

James C. Shannon, May, Garrett, Miller & Parsons, Richmond, Va., for Garlock, Inc., Precision Seal Division.

William B. Eley, Eley, Rutherford & Leafe, Norfolk, Va., for Eagle-Picher Industries, Inc.

Gerard E. W. Voyer, Taylor, Walker, Bernard & Adams, Norfolk, Va., for Unarco Industries.

M. Stuart Bateman, Bateman, Downing, Redding & Downing, Newport News, Va., for Fibreboard Corp.

Herbert V. Kelly, Jones, Blechman, Woltz & Kelly, Newport News, Va., for GAF Corp.

William L. Dudley, Jr., Doumar, Pincus, Knight & Harlan, Norfolk, Va., for Armstrong Cork Co.

Archibald Wallace, III, Sands, Anderson, Marks & Miller, Richmond, Va., for H. K. Porter Co. and Southern Textile Corp.

Worth D. Banner, White, Reynolds, Smith & Winter, Norfolk, Va., for Pittsburgh Corning Corp.

Henry C. Morgan, Jr., Pender, Coward, Addison & Morgan, Virginia Beach, Va., for Keene Corp.

John Y. Pearson, Jr., Willcox, Savage, Lawrence, Dickson & Spindle, P.C., Norfolk, Va., for The Celotex Corp.

Before MacKENZIE, Chief District Judge, and KELLAM and CLARKE, District Judges.

## AMENDED OPINION AND ORDER

CLARKE, District Judge.

Between 1977 and 1980 Neil R. Peterson defended the United States in a major group of asbestos cases (the Norfolk cases) in the Norfolk and Newport News Divisions of the United States District Court for the Eastern District of Virginia. In 1980, Mr. Peterson joined the law firm of Greitzer and Locks. As of April 23, 1981, Greitzer and Locks was co-counsel of record representing two hundred sixty (260) plaintiffs, the United States being involved in two hundred twenty-three (223) of such claims. This matter is before the Court to determine whether the employment of Greitzer and Locks of Neil R. Peterson requires disqualification of the law firm from further participation in the Norfolk cases.

### Background

This matter arises out of one group of a great number of claims that have been brought in various jurisdictions by plaintiffs alleging that they have contracted asbestos-related diseases through exposure to asbestos while employed at various government and private shipyards and plants. The plaintiffs have brought these suits against the manufacturers of the asbestos products and in many cases the manufacturers have brought in the Government and the various shipyards as third-party defendants to the actions. In some cases, the plaintiffs have filed direct actions against the United States.

The Norfolk litigation presently* involves three hundred thirty-three (333) individual plaintiffs who have filed asbestos-related claims in the Norfolk and Newport News Divisions of the United States District Court for the Eastern District of Virginia. In the Norfolk litigation, the United States is a party to the claims of two hundred forty-six (246) of these individual plaintiffs. These two hundred forty-six (246) individual claims are represented in seventy-seven (77) separate civil actions. A number of the defendant-manufacturers of asbestos in the Norfolk cases have filed a motion to disqualify the law firm of Greitzer and Locks, which as of April 23, 1981, serves as co-counsel representing two hundred sixty (260) plaintiffs in the asbestos cases filed and pending in this Court, because of the firm's employment of Neil R. Peterson, who previously represented the Government in the Norfolk litigation. The full statistics relating to the involvement of Greitzer and Locks, Mr. Peterson and the United States are revealed in the following tabulation.

*Pending Asbestos Cases
Norfolk/Newport News Divisions
As of April 23, 1981

| | |
|---|---|
| Total number of individual plaintiffs | 333 |
| Total number of civil actions | 114 |
| Total number of plaintiffs where United States is a party | 246 |
| Total number of civil actions where United States is a party | 77 |
| Total number of plaintiffs represented by Greitzer and Locks | 260 |
| Total number of civil actions where Greitzer and Locks is co-counsel | 78 |
| Total number of plaintiffs where United States is a party and Greitzer and Locks is co-counsel | 223 |
| Total number of civil actions where United States is a party and Greitzer and Locks is co-counsel | 67 |

The defendants urge that Canons 4, 5, and 9 and Disciplinary Rule 5–105(D) require the disqualification of Peterson's law firm despite the screening arrangements adopted by the firm. Neil Peterson and the law firm of Greitzer and Locks urge that the screening procedures adopted by the firm will adequately shield Mr. Peterson from the rest of the firm's involvement in this litigation so that the firm need not be disqualified from continued participation in this litigation.

This motion to disqualify was argued before the Court on January 27, 1981. On February 27, 1981, an evidentiary hearing was held before the three active status judges of the Norfolk and Newport News Divisions of the Court sitting en banc.

### Facts

In 1977 Neil R. Peterson was employed as Special Litigation Counsel in the Department of Justice. As Special Litigation Counsel, Peterson's duties were "to be generally involved with the coordination of the defense of asbestos litigation against the United States, and to personally undertaken [sic] the defense of one major group of asbestos cases, the so-called 'Norfolk cases.' " (Affidavit of Neil R. Peterson p. 7). Mr. Peterson's affidavit states that, in the Norfolk cases, he was involved in litigating three types of cases: suits by civilian employees of the United States working at the Norfolk Naval Shipyard in Portsmouth, Virginia, against various manufacturers of asbestos who, in turn, impleaded the United States as a third-party defendant; suits by former members of the United States Navy or the Naval Reserve against various manufacturers of asbestos, who in turn impleaded the United States; and suits by employees of the Newport News Shipbuilding and Dry Dock Company against various manufacturers of asbestos

who have in turn impleaded the United States as a third-party. In this last category, there are also direct actions filed by the plaintiffs against the United States. Mr. Peterson also participated with defense counsel in several settlement negotiations and reached a settlement agreement in *Glover v. Johns-Manville Corp., et al. v. United States.*

At least as early as January 1980, Mr. Peterson began to negotiate for employment with a private firm. (Transcript of Hearing February 27, 1981, p. 69). Mr. Peterson left the Department of Justice on October 3, 1980, and on October 6, 1980, Mr. Peterson joined the law firm of Greitzer and Locks. Greitzer and Locks is a five-man firm (two partners and three associates) located in Philadelphia, Pennsylvania. Mr. Peterson is working for the firm as a salaried employee, or associate. The firm serves as co-counsel representing 260 of the 333 plaintiffs in the asbestos cases filed and pending in this Court and represents approximately 1500 plaintiffs in claims in various jurisdictions.

Although it was agreed at the outset of Peterson's association with the firm that Peterson would not participate in the Norfolk litigation, it is undisputed that Mr. Peterson was hired by Greitzer and Locks because of his expertise in asbestos litigation and with the understanding that he would participate in asbestos litigation in other courts.[1] The decision of the firm to bar Peterson from participating in the Norfolk litigation was made apparently on the grounds that such participation would violate Ethics in Government Act, 18 U.S.C. § 207(a) (1980),[2] and not because Peterson possessed any secrets or confidences of the Government. (Transcript of Hearing held on February 27, 1981, p. 158).

Mr. Peterson vigorously urges that, while serving as Special Litigation Counsel in the

---

1. Greitzer and Locks apparently intended to bar Peterson from all Norfolk asbestos litigation handled by the firm without regard to whether the United States is a party to any specific action.

2. 18 U.S.C.A. § 207(a) prohibits a former government employee from acting as agent or attorney on a case or other particular matter involving specific parties in which the United States is a party or has a direct and substantial interest and in which he participated personally and substantially as a government employee.

Department of Justice, coordinating the defense of asbestos litigation against the United States and personally defending the United States in the Norfolk cases, he did not gain or have access to any confidential information or secrets of the Government that would in any way aid any of the plaintiffs in the Norfolk litigation. More specifically, Peterson asserts that he has no "present" or "specific" recollection of any such information but that his "general" recollection of the information to which he was privy while employed by the Department of Justice is that the information would be of no litigative value to the plaintiffs. The various "client" agencies of the Department of Justice disagreed as we shall later see.

In September 1980, Peterson notified the Government of his intent to participate in asbestos litigation upon his association with the firm of Greitzer and Locks and sought confirmation that his representation would pose no conflict in terms of his previous representation of the United States. In addition, Peterson requested a waiver of any imputed disqualification of the firm of Greitzer and Locks from continued participation in the Norfolk litigation provided that the firm complied with certain screening provisions. These screening provisions stated that Peterson:

(1) Could not directly work on the Norfolk cases.

(2) Could not advise them on any matters concerning those cases.

(3) Could not participate indirectly in those cases, by way of legal analysis, taking or preparing for any discovery, advice or in any other way whatsoever.

(4) Could not be given access to any of the files.

(5) Could not share in any monies derived from those cases.

In response to Peterson's request for confirmation of his participation in various asbestos litigation, the Department of Justice circulated a letter to the various client agencies to determine whether any agency would object to Peterson's participation in actions against the United States in cases in which Mr. Peterson had had no personal or supervisory role while at the Department of Justice. Specifically, the Department was concerned that Peterson may have acquired privileged information about the agencies through the confidential attorney-client relationship. The Department of Health and Human Services responded on November 26, 1980, stating:

Based on our lengthy association with Mr. Peterson in preparation for the defense of asbestos cases in which this Department is or may be a defendant we have the following concerns about Mr. Peterson's current activities:

Mr. Peterson has had free and complete access to records of this Department regarding the effects of asbestos.

He has had immediate and constant contact with employees of this Department who are experts in this area of science.

In personal meetings and interviews with scientific employees of this Department, who will in all likelihood be witnesses in these cases, he has in many cases established a close working relationship and unique rapport. Thus, he has been able to assess the strengths and weaknesses of our position and to even formulate the manner in which the factual and scientific portion of the cases will be presented.

Consequently, we have serious reservations about the propriety of Mr. Peterson's continued activities in these cases because our collaboration with Mr. Peterson seems to warrant a conclusion that an attorney-client relationship existed between Mr. Peterson and possible witnesses in these cases who are employed by this Department.

Defendant's Exhibit 7.

The General Services Administration responded on December 3, 1980, stating:

Mr. Peterson was Special Litigation Counsel for 3 years, approximately 2 of which he spent as coordinator of all asbestos litigation. In fact, Mr. Peterson states that he was "strategy coordinator

of asbestos litigation against the United States." As such, his position would refute his statement that he has "... no 'inside' knowledge concerning any agency of the United States in relation to asbestos issues, either documentary or mental ..."

As "strategy coordinator," he would be privy to inside, special information, as well as, trial strategy used in the asbestos cases. Since most asbestos cases concern similar legal and factual issues, Mr. Peterson is knowledgeable on the strategy position that the Government presently takes and will probably take on all cases (whether or not Mr. Peterson personally handled them).

Defendants' Exhibit 6.

On December 4, 1980, the U.S. Department of Labor responded:

[W]e know of no confidential information supplied to Mr. Peterson in connection with asbestos litigation. However, we cannot be positive that no such information was supplied. In any event, our concern would not be so much with specific cases as it would be with Mr. Peterson's knowledge, gained as a result of his employment with the Department of Justice, of the Government's tactics and strategy in asbestos litigation. We feel that Mr. Peterson must be as familiar with the Government's tactics and strategy, and its strengths and weaknesses, and what it can and cannot prove as anyone. It is our opinion that all of this must be considered in considering Mr. Peterson's request.

Defendants' Exhibit 9.

Based on these responses and its own evaluation of the situation, the Department of Justice had serious concerns that Peterson's participation on behalf of the firm in other asbestos litigation against the United States would either intentionally or through mere inadvertence erode the effectiveness of the proposed screen in the Norfolk and Newport News cases. It felt that if Peterson were to participate in litigation involving similar if not identical legal and factual issues present in the Norfolk litigation the "screen" may prevent him from communicating information to his new law associates about the Norfolk cases, however, the screen would not prevent him from using and communicating the very same information in connection with the other similar cases. As a result, the Department expressly conditioned its granting of a waiver of disqualification of the firm upon the firm's promise to adopt procedures to screen Peterson from involvement in any cases where the United States was a party. Specifically, the Government required that Peterson be screened from and not participate in any way in any case in which the United States is, or may become, a direct defendant. In addition, the Department required that, in cases where the United States is or may become a third-party defendant, Peterson's participation be confined to those aspects of the plaintiffs' cases against the direct defendants and that Peterson be barred from participating in taking discovery from the United States, deposing or cross-examining any Government witnesses or giving advice in such matters.

By letter of January 7, 1981, Mr. Rogovin as counsel for Mr. Peterson, acknowledged the concerns of the Government and agreed that these additional safeguards would be adopted by Peterson and the law firm. Based upon this promise to institute these additional safeguards, on January 9, 1981, the Department of Justice waived the imputed disqualification of the firm of Greitzer and Locks in the Norfolk litigation.

*Discussion*

The ethical standards relating to the practice of law in this Court are set forth in the American Bar Association Code of Professional Responsibility (ABA Code), *see* Local Rules of Practice, United States District Court of the Eastern District of Virginia, Rule 7(I); and it is the non-delegable responsibility of this Court to see that lawyers practicing before this Court maintain the highest standards of professional conduct in the management of cases before it, and to insure that nothing, not even the appearance of impropriety, is permitted to

tarnish the judicial process or shake the confidence of the public in the integrity of the legal profession. *Kesselhaut v. United States*, 555 F.2d 791, 794, 214 Ct.Cl. 124 (1977); *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980); *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706, 710 (7th Cir. 1976); *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975); *In re Gopman*, 531 F.2d 262, 266 (5th Cir. 1976); *Richardson v. Hamilton International Corporation*, 469 F.2d 1382, 1385 (3d Cir. 1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). Accordingly, any waiver filed by the Government is not binding upon this Court. *See Kesselhaut v. United States*, 555 F.2d at 794. Indeed, without firm judicial support, the high moral standards set out in the ABA Code would be "only reverberating generalities." *Empire Linotype School v. United States*, 143 F.Supp. 627, 633 (S.D.N.Y.1966). Thus, it is the clear and independent duty of this Court to determine, after analyzing all of the circumstances in this matter in light of the goals of the Code of Professional Responsibility and the role of the legal profession in our society, whether the employment by Greitzer and Locks of Neil Peterson, who previously represented the United States in the Norfolk cases, requires disqualification of the law firm from further participation in Norfolk cases involving the United States.

Disciplinary Rule 9–101(B) states: *A lawyer shall not accept employment in a matter in which he had substantial responsibility while he was a public employee.* The policy considerations underlying the mandatory prohibition of DR 9–101(B) are several: "The treachery of switching sides; the safeguarding of confidential governmental information from future use against the Government; the need to discourage Government lawyers from handling particular assignments in such a way as to encourage their own future employment in regard to those particular matters after leaving Government service, and the professional benefit derived from avoiding the appearance of evil." American Bar Association Committee on Ethics and Professional Responsibility, Formal Opinion 342, p. 3–4 (November 24, 1975) (hereinafter Formal Opinion 342). The Ethical Consideration underlying DR 9–101(B) is that such conduct "would give the appearance of an impropriety even if none exists," EC 9–3, in violation of Canon 9 which provides that "A Lawyer Should Avoid Even the Appearance of Impropriety."

The law presumes that an attorney possesses all confidential information to which he had access in his prior representation of a client, *see Arkansas v. Dean Foods Products Co.*, 605 F.2d 380, 384–85 (8th Cir. 1979), *overruled on other grounds, In re Multi-Piece Rim Products Liability*, 612 F.2d 377, 378 (8th Cir. 1980); *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d at 710; *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973); and this rule requiring attorneys to refrain from involvement in matters in which they had substantial responsibility while public employees recognizes the potential that exists for attorneys to disclose the confidences of former clients, in violation of the Disciplinary Rule of Canon 4, "A Lawyer Should Preserve the Confidences and Secrets of a Client." Requiring lawyers not to accept employment under these circumstances or disqualifying lawyers from participating in such matters "frees lawyers from the difficult task of erecting Chinese walls in their own minds between what is confidential and what is not, and forwards the public's interest in maintaining the highest standards of professional conduct and the scrupulous administration of justice." *Hull v. Celanese Corp.*, 513 F.2d at 569.

In a professional relationship, "[B]oth the lawyer and the client should expect that the lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation on the client's behalf." *Trone v. Smith*, 621 F.2d at 998. Where the potential for disclosure of confidences exists, disqualification is required because, as stated by the Second Circuit in *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d at 571:

[A] lawyer's good faith, although essential in all his professional activity is, nevertheless, an inadequate safeguard when standing alone. Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it into a telling advantage in the subsequent litigation. Or, out of an excess of good faith, a lawyer might bend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to an appearance of impropriety. In neither event would the litigants' or the public's interest be well served. The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage.

■ While employed as Special Litigation Counsel in the Department of Justice, Peterson personally defended the United States in the Norfolk asbestos litigation. Clearly, Peterson is barred by DR 9–101(B) and 18 U.S.C.A. § 207(a) from participating in the Norfolk litigation and no one contends that Peterson is eligible to participate personally in the Norfolk litigation involving the Government.

As stated before, Peterson adamantly maintains that despite his extensive involvement in the Norfolk cases and his involvement in coordinating the defense of all asbestos litigation against the United States, he has absolutely no "useful" or "inside" Government information that would be of any litigative value to the plaintiffs. More specifically, he states that he has no "present" or "specific" recollection of any such information but that his "general" recollection of the information to which he was privy while employed by the Department of Justice is that the information would be of no benefit to the plaintiffs, nor would its disclosure disadvantage the Government. However, as noted above and explained below, it is the position of the Government that Peterson does possess some confidences or secrets of the Government which would in fact aid the plaintiffs in the Norfolk litigation to the detriment of the United States.

■ When Peterson left the Department of Justice and joined a private law firm which represents plaintiffs in asbestos litigation, the Government had serious concerns about Peterson's participating in cases where the United States was involved. The General Services Administration, the Department of Health and Human Services, and the Department of Labor had all expressed concern that Peterson either obtained or might have obtained confidential information concerning their agency while serving as an attorney for the Department of Justice. These concerns are not frivolous since, as a result of an attorney-client relationship, a presumption arises that confidential communications have been exchanged. *Arkansas v. Dean Foods Products Co.*, 605 F.2d at 384–85; *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d at 710; *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562.

Based on the concerns expressed by the client agencies and its own evaluation of the situation, the Department of Justice conditioned the granting of the waiver of the law firm on Peterson's being screened from participating in cases where the United States was a party. Specifically, the United States was concerned that information Peterson might communicate to his law partners while participating in cases similar to the Norfolk cases would then be used by those partners in the Norfolk litigation.

Peterson and Greitzer and Locks concede that Peterson is barred by 18 U.S.C.A. § 207(a) from participating personally in the Norfolk litigation in which the Government is a party. This Court FINDS, how-

ever, that based on Peterson's prior representation of the Government and the express concerns of the Government that Peterson is disqualified from such representation by not only 18 U.S.C.A. § 207(a) but also DR 9–101(B) and the Disciplinary Rule of Canon 4.

Disciplinary Rule 5–105(D) states: *If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner or associate or any other lawyer affiliated with him or his firm, may accept or continue such employment.* Disciplinary Rule 5–105(D) recognizes "the close, informal relationship among law partners and associates and upon the incentives, financial and otherwise, for partners to exchange information freely among themselves when the information relates to existing employment." Formal Opinion 342, n.2. Because of the continuing danger that an attorney may unintentionally transmit information gained through the attorney's prior association due to the day-to-day contact an attorney has with other members of his firm, disqualification is required to guard against the possibility of inadvertent use of confidential information. *See Silver Chrysler Plymouth Inc. v. Chrysler Motors Corp.*, 518 F.2d 751 (2d Cir. 1975), *overruled on other grounds* in *Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir. 1980) (en banc). This disqualification is required without showing that an attorney possessed explicit confidences which were expressly transmitted to or received by the other members of the law firm during some conference, letter-drafting or phone conversation and is required whether or not the other members of the firm are actually exposed to the information. *Trone v. Smith*, 621 F.2d at 999; *see also Westinghouse Electric Corp. v. Kerr McGee Corp.*, 580 F.2d 1311 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d at 711; *Handelman v. Weiss*, 368 F.Supp. 258 (S.D.N.Y.1973). The threat remains that the firm may have been tainted by the improper receipt of privileged information and it is the possibility of the breach of confidence, not the fact

of the breach that triggers disqualification. *Trone v. Smith*, 621 F.2d at 999; *see also Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir. 1980) (en banc).

Under DR 5–105(D) and Canon 9, a court must disqualify a law firm from continued representation where such representation constitutes a threat of taint to the integrity of the trial or where such continued representation creates the appearance of impropriety. *Armstrong v. McAlpin*, 625 F.2d 433; *Cheng v. GAF Corp.*, 631 F.2d 1052, 1058 (2d Cir. 1980); *Board of Education v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979). The integrity of a trial may be tainted where a law firm is potentially able to use information which a former Government attorney gained in confidence while serving as a public employee and which was unavailable to the other side. *Armstrong v. McAlpin*, 625 F.2d at 444.

Law firms have employed various methods of screening a possibly tainted attorney from the rest of the firm's involvement in a particular case in order to avoid the difficulties caused by an inflexible application of DR 5–105(D). The ABA stated in Formal Opinion 342 that the Government may waive the vicarious disqualification of a law firm where the Government is satisfied that a former Government attorney is (1) effectively screened and isolated from any direct or indirect participation in the matter and (2) where there is no appearance of significant impropriety affecting the interests of the Government. However, despite a Government waiver, it remains the clear and independent duty of the Court to scrutinize the screening procedures and to disqualify the firm if the Court finds that, despite the attempted screening, continued representation constitutes a threat to the integrity of the trial or creates the appearance of impropriety. Furthermore, if, after evaluating the sufficiency of a proposed screen a court still harbors doubts as to the sufficiency of the screen, the court should resolve the issue in favor of disqualification. *Cheng v. GAF Corp.*, 631 F.2d at 1058; *Hull v. Celanese Corp.*, 513 F.2d at 571; *Novo*

*Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186, at 189–90 (7th Cir. 1979); *IBM Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978).

Peterson and his firm, Greitzer and Locks, urge that their screening procedures, some of which were instituted before Peterson joined the firm and some of which were adopted over three months after Peterson joined the firm are sufficient to isolate Peterson from the rest of the firm's involvement in the Norfolk cases so as to remove any threat to the integrity of the trial or create any unacceptable appearance of impropriety. To repeat, the safeguards adopted by the firm provide that Peterson is not to work directly or indirectly on the Norfolk cases, that Peterson is not to have any access to any Norfolk litigation files and that Peterson is not to share in any income derived from the Norfolk litigation. The attorneys and staff in the firm have been instructed not to discuss any of the Norfolk cases with Mr. Peterson either directly or within his earshot. In addition, Peterson and the firm have agreed that Peterson will not participate in any way and will be screened from substantive involvement and financial participation in cases in which the United States is or may become a direct defendant. Furthermore, where the United States is or may become a third-party defendant, Peterson will be confined to participation against the direct defendants only and will not participate in any aspect of the case, including discovery, relating to the involvement of the United States. In these cases, the firm will conduct a case-by-case review to determine whether Mr. Peterson should refrain from participating at all.

■ Peterson's employment with Greitzer and Locks constitutes a threat to the integrity of the Norfolk litigation despite the attempts of the firm to screen him from any participation in the litigation. Peterson will be participating with other members of Greitzer and Locks in the trial or settlement of over a thousand asbestos cases in other jurisdictions. In addition, the Norfolk litigation in which Greitzer and Locks are co-counsel as of April 23, 1981, involves the claims of two hundred sixty (260) individual plaintiffs represented in seventy-eight (78) separate civil actions. Greitzer and Locks is a six-man law firm. These cases will take a considerable amount of time to litigate and, despite the protestations of Peterson and the firm, it is unclear how disclosures, even inadvertent, can be prevented given the size of the firm and the prolonged nature of the litigation. Because of the magnitude of the litigation, there is the continuing risk that the agreement not to talk with Peterson about the cases or speak near Peterson about the cases will not be effective given the close, informal relationship which exists among law partners and associates, especially in a firm the size of Greitzer and Locks and the financial incentives which exist to discuss current employment.

In addition, it is undisputed that Peterson joined the law firm several months before securing from the Government a waiver of imputed disqualification. From October until early January, both Peterson and the firm were under the impression that Peterson was not barred from participating in other cases where the United States was a direct party. The Government granted the waiver conditioned upon the firm's agreeing to screen Peterson from any participation in such cases. However, prior to acquiring the waiver Peterson did in fact file a motion to appear in the New Jersey cases in which the United States was a direct defendant. Because of the lapse of time between accepting the employment and securing the terms of the Government's waiver there exists the real possibility that improper communication did in fact pass between Peterson and his firm.

Furthermore, the screening proposition that Peterson limit his involvement to participation only against the direct defendants in cases where the United States is or may become a third-party defendant is unrealistic and does not recognize the subtle and complex dynamics of litigation. In addition, although the law firm has offered to completely screen Peterson out of these cases on a case-by-case basis where they

feel it is necessary to do so, this would require the firm to make awkward determinations often on the eve of trial and in the face of serious financial considerations.

Furthermore, although Peterson is not to participate in any monies derived from the Norfolk litigation where the Government is involved, the magnitude of the claims involved and the size of the firm make it highly speculative if not incredible to presume that Peterson would not participate directly or indirectly in any of the monies received by the firm. These Norfolk cases present the possibility of the firm's recovering settlements or judgments on two hundred twenty-three (223) (Government cases) individual claims. Any income derived from these cases is bound to be channeled into the capital improvement of the firm and the salaries of its employees, including Peterson. It is likely that any capital improvements in a six-man law firm will inure either directly or indirectly to the benefit of Peterson as one of the members of that firm. Thus, the circumstances surrounding this particular litigation and the size of the law firm preclude the effective shielding of Mr. Peterson from involvement in the monies derived from the Norfolk litigation. While we are not rejecting screening procedures nor are we applying an inflexible rule, no case has been cited to this Court nor has this Court been able to find any case where screening has been approved where the litigation is of such a protracted nature and which plays such a prominent role in a law firm's activities as is here presented.

Not only is the integrity of the litigation threatened by Peterson's employment with Greitzer and Locks, but such employment also creates the unacceptable appearance of impropriety and, as noted earlier, the Court, in considering a motion for disqualification, must also consider the appearance of impropriety. The public understandably will see an appearance of impropriety where, despite the clear prohibition of the Code, Peterson changes sides in the middle of ongoing litigation and his firm is allowed to continue its participation on the basis of the assurances that Peterson will not discuss the cases.

The public will judge the appearance of impropriety from a layman's viewpoint without an appreciation of a lawyer's obligation as an "officer of the court." Briefly restated, the following are the undisputed facts from which the public would gain an impression of the impropriety of the law firm's continuing in the Norfolk cases where the Government is a party:

(1) While having the responsibility of defending the United States against vigorous attacks by Greitzer and Locks, Peterson was negotiating with Greitzer and Locks for a job.

(2) Peterson accepted employment with the law firm and went to work with the firm before any agreement was worked out between the Government and the firm.

(3) Peterson worked with the firm for three months before waiver agreement was worked out.

(4) Peterson, after joining the firm, entered or tried to enter a case against the Government pending in New Jersey and would be presumed to have had some conversations within the law firm about that case.

(5) The 1500 plus claims of the plaintiffs being represented by Greitzer and Locks involve many millions of dollars and the law firm's fees whether contingent or otherwise potentially involve millions of dollars.

The public not only could but very likely would conclude that a voluntary screening process with no possibility of independent monitoring would be breached. For the Court to approve the continuance of Greitzer and Locks in the Norfolk cases where the Government is a party would seriously compromise the public's perception of the integrity of this Court and shake the public's confidence in the administration of justice.

As set out above, despite the fact that a waiver was granted by the Government, it remains the duty of this Court to insure that lawyers observe the highest standards

of professional conduct in litigation before it and this is a duty owed to the parties, the public, and the members of the bar. Without questioning Peterson's integrity or the sincerity of his efforts to disassociate himself from the Norfolk litigation, the Court is not satisfied that, under the facts of this case, screening will be effective. Certainly the lay public cannot be expected to perceive the screening to be effective. Accordingly, the Court FINDS that continued participation by Greitzer and Locks in the Norfolk asbestos litigation where the Government is a party constitutes a threat to the integrity of the trial and creates the appearance of impropriety. *Armstrong v. McAlpin,* 625 F.2d 433; *Cheng v. GAF Corp.,* 631 F.2d 1052; *Board of Education v. Nyquist,* 590 F.2d 1241.

The question remains whether Greitzer and Locks should be barred from those Norfolk cases in which the Government is not a party. Rule 7(D), Local Rules of Court for the Eastern District of Virginia, provides that out-of-state counsel may, upon motion, be permitted to appear and conduct specific cases in association with a duly qualified member of the bar of this Court. Pursuant to this rule, Greitzer and Locks have associated two local counsel in all of their cases pending in the Newport News and Norfolk Divisions of this Court. As of April 23, 1981, Greitzer and Locks was associated with local counsel in thirty-seven cases where the Government is not a party. As yet there is no allegation that local associate counsel have been sufficiently exposed to Greitzer and Locks since Peterson's becoming a member of that firm to have received information which would bar them under the reasoning of Rule 5–105(D). The Court foresees, however, that if Greitzer and Locks and its two local counsel continue to work together in the thirty-seven non-Government cases, the status of the local lawyers as counsel for all two hundred sixty plaintiffs will be jeopardized. It is important to the plaintiffs that this not happen.

In fulfilling its duty, this Court is not unmindful of the right of plaintiffs to retain counsel of their own choosing and the delays inherent in changing attorneys in the midst of complex litigation. However, as stated before, in the Norfolk cases, all of the plaintiffs are represented and have been represented since inception of their actions by able local counsel. The public does not have an absolute right to maintain any particular counsel, *IBM Corporation v. Levin,* 579 F.2d at 283; *Kramer v. Scientific Control Corporation,* 534 F.2d 1085, 1093 (3d Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976), and the right of the public to retain counsel of its choice is secondary in importance to the Court's duty to maintain the highest standards of professional conduct to insure and preserve trust in the integrity of the bar. *Silver Chrysler Plymouth Inc. v. Chrysler Motors Corp.,* 518 F.2d at 757; *Hull v. Celanese Corp.,* 513 F.2d at 569; *see also Telos Inc. v. Hawaiian Telephone Co.,* 397 F.Supp. 1314 (D.Haw. 1975). The courts must strike a reasonable balance between the public's right to freely chosen counsel and the court's duty to maintain the highest ethical standards. The Court must also act quickly to prevent local counsel from becoming subject to challenge. In this case, the Court believes the proper balance has been maintained by our decision.

For all the reasons stated in the Opinion, the Court FINDS that the law firm of Greitzer and Locks is DISQUALIFIED from further participation in the Norfolk cases.

In order to minimize the burden which may fall upon the affected plaintiffs by virtue of removing part of their legal team in the middle of complex litigation, the Court notes that these cases are currently being held in abeyance pending guidance from the United States Court of Appeals for the Fourth Circuit and that this Court will allow such additional time as is deemed necessary in setting these cases for trial to permit remaining plaintiffs' counsel to thoroughly prepare their cases.

The Court acknowledges the hardship claimed by Greitzer and Locks in disqualifying it from participating further in the Norfolk litigation. This hardship quite proper-

ly rests with the firm which knowingly undertook the employment of an individual in the face of the Code's clear prohibition, without first securing a Government waiver and seeking approval of the screening procedures from this Court. If the Court had been consulted prior to the employment, the Court would have reached the same conclusion but no loss would have occurred to Peterson or Greitzer and Locks.

Accordingly, the Court DISQUALIFIES Greitzer and Locks from further participation in the Norfolk cases.

It is so ORDERED.