**UNITED STATES of America**

**v.**

**Rodney Gene SCOTT, Defendant.**

**Criminal No. 2:97CR93.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Sept. 30, 1997.

Fernando Groene, Asst. U.S. Atty., Norfolk, VA, for Plaintiff.

William C.L. Taliaferro, Rabinowitz, Rafal, Swartz, Taliaferro & Gilbert, P.C., Norfolk, VA, for Defendant.

## ORDER and OPINION

MORGAN, District Judge.

A hearing on the government's motion to disqualify defense counsel for an actual or potential conflict of interest was conducted on September 4, 1997. At the conclusion of the hearing, the Court GRANTED the government's motion and ordered defendant's privately retained attorney disqualified. The Court now supplements its ruling with the following written Order and Opinion.

### Factual and Procedural History [1]

On June 24, 1997, Virginia State Police stopped a southbound car for a traffic infraction on the Chesapeake Bay Bridge Tunnel. The car, driven by Rodney G. Scott of New York, was registered to Khalid Wheeler of Colonial Heights, Virginia. Scott consented to a search of the car; that search revealed a quantity of 3500 grams of crack cocaine concealed in a hidden, hydraulically-operated compartment in the trunk. Law enforcement officers promptly arrested Scott who waived his rights and agreed to cooperate with the officers.

The government asserts that Scott told the officers that he was traveling to Virginia from New York and had done so on eight previous occasions. receiving between $500 and $1,000 per trip. Scott also described a maroon Acura car, driven by the alleged leader of the drug conspiracy, that had followed him from New York. A Virginia State Trooper reported observing a maroon Acura following Scott on Route 13 on the Eastern Shore of Virginia. Scott told officers where the maroon Acura could be found at a residence in Virginia Beach, Virginia. Virginia Beach Narcotics detectives then visited that location and observed a maroon Acura with New York license plates parked in the driveway.

On June 25, 1997, the United States formally charged Scott with conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846. At an initial appearance before Senior District Judge John A. MacKenzie on that same day, Scott stated that he was indigent and wanted an attorney appointed for him. While Judge MacKenzie was questioning Scott, two men, Kevin Clark and James Walden, Jr. allegedly stormed into the courtroom with Clark shouting: "Yo man, don't say anything more. Keep your mouth shut. We've got you a lawyer. Don't say anything on anybody. Just keep quiet." Walden, who was wearing an empty gun holster, and Clark sat in the courtroom during the hearing, allegedly staring at Scott and shaking their heads at him.

After the hearing, FBI agents obtained photo identification from both men and left the courthouse to identify the vehicle driven by them. Clark and Walden then ran away from the courthouse. Moments later, the FBI agents encountered the aforementioned maroon Acura exiting the parking lot of an office building in downtown Norfolk, site of the law firm retained to represent Scott.

At a preliminary hearing on June 30, 1997, Scott dismissed his court appointed counsel, and privately retained counsel assumed his representation. The evidence, according to the government, shows that the privately retained attorney requested a fee of $25,000. James Walden, Jr., under the alias "Chris Mack," paid $4,500 of the fee in cash at the private counsel's office. On another occasion, Walden sent private counsel $6,000 via Western Union wire transfer. After Walden paid $4,000 in cash on June 26, 1997, the private attorney's secretary issued receipts showing that payment had been made by Scott, not Walden. Further, private counsel

---

1. The Court makes no factual findings with respect to the defendant's guilt or innocence in this opinion, and recites facts only as background of the issue before it.

received additional payment for Scott's legal fees from an unidentified female.

On July 7, 1997, Walden was located, and he was ordered to appear before a Norfolk Grand Jury investigating the Scott case on July 14, 1997. On July 10, 1997, Walden visited the same firm which privately represented Scott and retained a different attorney in the same firm to represent him in the Grand Jury proceeding on an hourly basis. Both Walden's Grand Jury testimony and the private firm's records reveal that Walden paid the private firm a total of $200 to represent him. The Grand Jury proceeding was subsequently postponed, and Walden appeared at the continued hearing with new counsel from a new firm. Walden refused to testify about substantive issues before the Grand Jury, citing his Fifth Amendment right against self-incrimination.

At Scott's arraignment on July 23, 1997, a different attorney from the private firm appeared on behalf of Scott. The arraignment was continued until this Court could rule on the motion to disqualify counsel.

### Summary of Arguments

The government argues that this Court should investigate the actions of Scott's private attorney and the firm of which he is a member to determine whether any potential or actual conflicts of interest exist that would require disqualification of defense counsel. The government argues that an actual conflict of interest is present because members or employees of the private firm will be called to testify at Scott's trial regarding the cash payment of legal fees by a third-party unindicted co-conspirator as possible evidence, of the existence of a drug conspiracy. The government also argues that an actual conflict of interest exists because the private firm represented both Scott and Walden in a substantially related matter.

The private firm representing Scott counters that no actual or potential conflict of interest is raised that would require the immediate disqualification of attorneys associated with it. Instead, the firm argues that it could continue to represent Scott through his trial, if the potential testimony of its members or employees could be stipulated. If members or employees of the private firm are forced to testify at trial, then the firm argues it would disqualify itself at that point.

### Analysis

 According to the United States Supreme Court, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). The District Court is placed in the position of weighing the defendant's interests in having counsel of his choice against the court's duty to maintain the integrity of the judicial process. While a defendant's choice of counsel is entitled to some weight, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160, 108 S.Ct. at 1698. As Judge Clarke has noted:

> It is the non-delegable responsibility of this Court to see that lawyers practicing before this Court maintain the highest standards of professional conduct in the management of cases before it, and to insure that nothing, not even the appearance of impropriety, is permitted to tarnish the judicial process or shake the confidence of the public in the integrity of the legal profession.

*In re Asbestos Cases*, 514 F.Supp. 914, 919–920 (E.D.Va.1981).[2] District Courts enjoy "substantial latitude" in addressing conflicts

---

**2.** The Court also recognizes another potential difficulty presented by denying the government's motion. If the court accepts the waiver and allows the privately retained attorney to proceed with representation, the defendant may later file an ineffective assistance of counsel claim, relying on the conflict as the basis for that claim. *See* *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir.1991) ("[W]hen counsel for a defendant in a criminal case has an actual conflict of interest ... and [it] adversely affects counsel's performance in the defense of the defendant, prejudice to the defendant is presumed and a new trial must be ordered").

of interest. *Wheat,* 486 U.S. at 163, 108 S.Ct. at 1699. One method of combating the problems associated with actual or potential conflicts of interest is for the Court to disqualify defense counsel. *See e.g., Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697 (holding that disqualification is proper where defendant sought to retain an attorney who had represented other members of the drug conspiracy, even though those members waived the conflict of interest); *Williams,* 81 F.3d at 1323 (holding that disqualification is proper where the defendant's attorney formerly represented a potentially important government witness in a substantially related matter); *Quintero v. United States,* 33 F.3d 1133, 1134 (9th Cir. 1994) (recognizing the potential conflicts of interests presented when a third party pays the indigent defendant's attorney's fees in a drug case).

█ Counsel owes the client a duty of loyalty and a duty to avoid conflicts of interest, which are "perhaps the most basic of counsel's duties." *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). The Supreme Court has warned of "the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise...." *Wood v. Georgia,* 450 U.S. 261, 269, 101 S.Ct. 1097, 1102, 67 L.Ed.2d 220 (1981). The Virginia Code of Professional Responsibility provides guidance as to the types of situations that raise the specter of actual or potential conflicts of interest.[3] The Code mandates that "[i]f, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any shall not continue representation in the trial." Pt. 6, § II, Rules of the Supreme Court of Virginia, Disciplinary

Rule 5–102(A). He may continue representation only until "it is apparent that his testimony is or may be prejudicial to his client." Pt. 6, § II, Rules of the Supreme Court of Virginia, Disciplinary Rule 5–102(B).[4] Under Disciplinary Rule 5–105(A), the Code also discourages multiple representation of clients involved in the same or a substantially related matter where the independent professional judgment of the attorney may be adversely affected. Moreover, Canon 9 provides than a lawyer should avoid even the appearance of impropriety in undertaking representation.

At the hearing, the government argued that its evidence at trial would show that (1) Scott worked as a drug courier; (2) members of the drug conspiracy retained an attorney on Scott's behalf to control Scott's cooperation with authorities; (3) members of the conspiracy paid the attorney's fees largely in cash inferring that the cash was proceeds from the drug conspiracy; (4) members of the drug conspiracy purposefully structured the fee payments between June 25 and June 30; and (5) Walden used an alias when making fee payments to hide his true identity. In an effort to establish the existence of a drug conspiracy involving Scott, the government asserted that it intended to call one or more members or employees of the law firm to testify at trial as to facts surrounding the cash payment of legal fees in this case.

The Court **FINDS** that testimony from the private firm's members or employees, if elicited at trial, would be adverse to the interests of defendant Scott. If the government seeks, at trial, to establish the existence of a drug conspiracy through the third-party fee payments, the private attorney would be placed in the untenable position of either stipulating to the admissibility of law firm records, or withdrawing as counsel for the defendant.

---

3. Local Rule 83.1(I) provides that "[t]he ethical standards relating to the practice of law in this Court shall be the Virginia Code of Professional Responsibility."

4. Exceptions exist where the testimony regards a matter of formality, where the nature and value of legal services rendered is at issue and where

"refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel." Pt. 6, § II, Rules of the Supreme Court of Virginia, Disciplinary Rule 5–101(B). Those exceptions are inapplicable in this case.

In addition, the private firm has undertaken the representation of an alleged second member of the drug conspiracy, Walden, in a substantially related matter while accepting payment from him for the legal fees incurred by Scott. While this situation may raise a potential conflict of interest which possibly could be cured by waiver, the appearance of impropriety described in Canon 9 of the Virginia Code of Professional Responsibility is unavoidable.

The Court is also persuaded by the effect which continued representation by the private firm may have on the defendant's voluntary choice to go to trial or plead guilty. If he wished to retain present counsel he may deem it expedient to plead guilty. If he proceeds to trial, then the private firm, if giving testimony, would have to withdraw its representation and court-appointed counsel would have to be selected. If the private firm wished to avoid testifying, then defense counsel would be compelled to stipulate the evidence regarding fee payments. Thus, testimony potentially damaging to the defendant would be unchallenged. In such case, defendant might feel obligated or pressured to plead guilty, thereby calling into question the voluntariness of his plea. On the other hand, the defendant may wish to plead guilty and cooperate with the government, but may be reluctant to do so because Walden, an alleged co-conspirator, had paid defendant's fee to the private attorney.

The private attorney's options are affected as well. If his client wishes to go to trial and there is testimony sought from his firm, he will have an added incentive to avoid such testimony. By the same token, the private attorney may be perceived by Scott as not encouraging cooperation with the government since Walden paid the private attorney and personally retained another member of the firm.

Accordingly, the Court **FINDS** that continued representation by current counsel presents actual and potential conflicts of interest and will give the appearance of impropriety.[5]

The Court **ORDERS** that no member of the law firm may represent defendant Scott in any matter related to this prosecution. The Court further **ORDERS** that the original court-appointed attorney be reinstated to represent defendant Scott in further matters pertaining to this case.

It is so **ORDERED**.

---

5. There is no evidence to suggest that the law firm would allow such actual or potential conflicts to affect its representation of Scott, but the Court is concerned with the appearance of impropriety to Scott, his alleged co-conspirators and the public. Neither does the Court doubt that the law firm would exercise its best efforts in the representation of Scott, but, even where an actual conflict could be avoided, the appearance of impropriety would remain.