STATE OF ARKANSAS, Plaintiff-Appellee, Cross-Appellant,

v.

DEAN FOODS PRODUCTS COMPANY, INC., Defendant-Appellant, Cross-Appellee.

Nos. 79–1350, 79–1357.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1979.

Decided Aug. 16, 1979.

---

1. The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota.

Richard P. Campbell, of McConnell & Campbell, Chicago, Ill., for Dean Foods Products Co.; Mark F. Leopold, Chicago, Ill., of counsel.

Philip E. Kaplan, of Kaplan, Brewer, Bilheimer & Marks, Little Rock, Ark., for State of Ark.

Before HEANEY and STEPHENSON, Circuit Judges, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

MARKEY, Chief Judge.

Antitrust action by the State of Arkansas (State) against Dean Foods Products Company, Inc. (Dean). The parties appeal and cross-appeal from an order of the United States District Court for the Eastern District of Arkansas, granting Dean's motion to disqualify the State's counsel, and denying Dean's motion to disqualify the State's co-counsel and the staff of the State's counsel. We affirm as to the State's counsel and co-counsel, and reverse as to the staff.

* HOWARD T. MARKEY, Chief Judge, United States Court of Customs and Patent Appeals, Washington, D. C., sitting by designation.

*Background*

Royce O. Griffin, Jr. (Griffin) joined Owens, McHaney & McHaney (McHaney firm) in May 1974. At that time, Dean, a processor and seller of dairy products, was a client of the McHaney firm.

During the Spring of 1975, the McHaney firm represented Dean in Bankruptcy proceedings involving Buckingham & Schutt, Inc. (Buckingham), Dean's distributor in eastern Arkansas. That representation involved a study of Dean's and Buckingham's marketing information. Following a November 1975, investigation by McConnell & Campbell (Dean's Chicago counsel) of Buckingham's price-fixing allegation against Dean, Dean decided not to sue Buckingham. Thereafter, the McHaney firm did no work on the Buckingham matter until the Summer of 1976.

Griffin left the McHaney firm at the end of November 1975. In January 1977, he became Assistant Attorney General for the State. Federal indictments issued in April, 1977, alleging dairy company price-fixing in central Arkansas. In May the present antitrust class action suit was filed by the State. The complaint, alleging statewide dairy company price-fixing and including Dean among the defendants, was signed by Griffin.

The State retained Mandell & Wright (the Susman firm) and Litman, Litman, Harris & Specter (the Specter firm) as special antitrust co-counsel.

The McHaney firm has been local counsel for Dean throughout this suit. Dean also retained McConnell & Campbell.

On January 29, 1977, Buckingham's name arose during a deposition. McConnell & Campbell examined Dean's records relating to Buckingham, including the bankruptcy file, and discovered Griffin's name on the McHaney firm's letterhead. On March 19, 1979, Dean moved for disqualification of the State's Attorney General and his Deputies and Assistants (including Griffin), and the Susman and Specter firms, their partners and associates.

The district court found the Buckingham bankruptcy matter and the present suit substantially related.

The court held that the State's reliance on a laches theory must fail "because of the important role of Mr. Griffin, the fact that the case is still in the discovery phase, the shortness of the delay (when compared to other cases), and the importance of the ethical issue involved . . . ."

Having found that Griffin did a title search and filed papers in the Buckingham case, but had never looked at the McHaney firm's Buckingham file and had no knowledge of its contents, the district court nonetheless concluded that Griffin had to be disqualified because of the imputation to him of confidential information imported to the partners in the McHaney firm. The court considered the "peripheral representation" exception articulated in *Silver Chrysler Plymouth, Inc. v. Chrysler Motor Corp.*, 518 F.2d 751 (2d Cir. 1975), inapplicable here because "Mr. Griffin's association with the McHaney firm was such that restricted and limited roles for Mr. Griffin in the firm's business were not the norm and that most matters were the subject of general discussion in the typical, relatively informal atmosphere of most small law firms."

By letter subsequent to its memorandum and order, the court informed the parties that the disqualification order applied to Griffin only, and not to his staff.

The district court denied the motion to disqualify the co-counsel Susman and Specter firms, holding that "a second tier irrebuttable presumption" was improper because co-counsel had never been involved in an attorney-client relationship with Dean.

*Issues*

The issues are whether the district court: (1) erred in finding a substantial relationship between the Buckingham matter and the present action, and whether the district court abused its discretion [1] in: (2) refusing

---

1. The order of the district court in a disqualification case will be upset only upon a showing of abuse of discretion. *Fred Weber, Inc. v.*

*Shell Oil Co.*, 566 F.2d 602, 605 (8th Cir. 1977), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978).

to dismiss Dean's motion for laches, (3) granting the motion to disqualify Griffin, (4) denying the motion to disqualify Griffin's staff, and (5) denying the motion to disqualify the Susman and Specter firms.

## OPINION

### In General

Disqualification of counsel, like other reaches for perfection, is tempered by a need to balance a variety of competing considerations and complex concepts. Disqualification in spasm reaction to every situation capable of appearing improper to the jaundiced cynic is as goal-defeating as failure to disqualify in blind disregard of flagrant conflicts of interest. Between those ethical extremes lie less obvious influences on the interest of society in the orderly administration of justice, on the interest of clients in candid consultation and choice of counsel, and on the interest of the legal profession in its reputational soul.

So too, the judicial effort to light a disqualification path is unlikely to result in an early formulation of rules universally applicable to the Canons of the Code of Professional Responsibility. Rigid rules can be sterile and lacking in universal application. At the same time, an "every case on its own facts" approach can be facile and unhelpful. Ethical experience is the key. Until more is gained, rigidity may be feasible at the far ends of the ethics spectrum, while flexibility governed by facts must reign in a gradually diminishing area between those extremes.

After a threshold "related matter" question, the present case requires that balances be struck between: (a) the interest of litigants in early resolution of a disqualification question and the continuing public interest in even a delayed dissipation of a conflict of interest; (b) the interest of a defendant in freedom from adverse advocacy by a lawyer formerly employed by defendant's counseling law firm and a state's interest in continuing with its counsel; (c) the interest of a defendant in freedom from adverse advocacy by lawyers who had served on the staff of, and as co-counsel with, the lawyer involved in (b) and the same interest of the state in continuing with its counsel.

A balance may be struck between the interests involved in (a) and (b) with the aid of fairly rigid considerations. In the current posture of disqualification ethics, balancing the interests involved in (c) must be influenced by the facts and their presumed effect in the light of human experience.

1. The district court did not err in finding a substantial relationship.

■ The rule was well described in *T. C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265, 268–69 (S.D.N.Y. 1953):

> [T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action [where] the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

> To compel the client to show, in addition to establishing that the subject of the present adverse representation is related to the former, the actual confidential matters previously entrusted to the attorney and their possible value to the present client would tear aside the protective cloak drawn about the lawyer-client relationship. For the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be pro-

tected by the rule [protecting client confidences].

*See Silver Chrysler, Inc.,* 518 F.2d at 754.

The Buckingham matter, in which the McHaney firm represented Dean, involved considerations of sales structure, customer lists, and purchases. An integral element in that matter was Buckingham's accusation that Dean engaged in price-fixing. The Buckingham matter is thus on its face substantially related to the present State allegation that Dean engaged in price-fixing.

Because we assume the disclosure of confidences and "will not inquire into their nature and extent," the State's argument that it must have an opportunity to show that no confidences bearing on related subject matter were disclosed, and to cross-examine the McHaney firm principals about the contents of the Buckingham file in support of that proposition, is without merit.

2. The district court did not abuse its discretion in refusing to dismiss Dean's motion for laches.

■ The State contends that Dean's motion is barred by laches because: (1) there is no evidence that McConnell & Campbell moved promptly on discovery of the potential conflict, and (2) the McHaney firm should have moved for disqualification when the complaint was filed, citing *Central Milk Producers Cooperative v. Sentry Food Stores, Inc.,* 573 F.2d 988 (8th Cir. 1978) and *Redd v. Shell Oil Company,* 518 F.2d 311 (10th Cir. 1975).

Neither of the State's citations is controlling here. *Central Milk Producers* involved not laches, but a finding of waiver by the parties seeking disqualification. Movants "not only waited more than two years after they knew Futterman [the attorney whose disqualification was sought] had been hired to formally raise the issue [of disqualification], but they specifically approved the arrangement followed by Pressman and Hartunian [the firm Futterman joined] with respect to screening Futterman from the case." 573 F.2d at 992. No such waiver is

alleged or present here. *Redd v. Shell Oil Company* involved a disqualification motion filed solely for delay. Burbidge, while employed by another firm, had done work for Shell. In early February 1974, he joined the firm representing Redd. On July 12, 1974, the Friday before the Monday trial, Shell moved to disqualify Burbidge. The court on appeal found that "[t]he late filing fully justified the [district court's] summary rejection of the motion." 518 F.2d at 315. The present situation, with the state's discovery not completed and defendants' substantive discovery not begun, is in no way analogous to that in *Redd v. Shell.* Nor is there any basis for concluding, as there was in that case, that the motion was filed solely for delay or "held in reserve until the most expedient time came along to file it." *Id.* at 315.

Disqualification is an ethical, not a legal matter, *American Can Company v. Citrus Feed Company,* 436 F.2d 1125, 1127 (5th Cir. 1971), and is in the public's, as well as the client's, interest. As was said in *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 574 (2nd Cir. 1973), "the court cannot act contrary to that interest by permitting a party's delay in moving for disqualification to justify the continuance of a breach of the Code of Professional Responsibility."

There is, moreover, no indication here, where the case is in its early stages, that the State relied to its substantial injury on Dean's delay. Under the circumstances present here, we are persuaded that the district court did not abuse its discretion in refusing to dismiss the motion as unduly delayed.

3. The district court did not abuse its discretion in granting the motion to disqualify Griffin.

■ This court has said that, under Canon 4 of the ABA Code of Professional Responsibility,[2] "[t]the attorney-client relationship raises an irrefutable presumption that confidences were disclosed." *Fred Weber, Inc.,* 566 F.2d at 608. Confidential disclosures, actual or presumed, necessitate

---

2. Canon 4. A lawyer should preserve the confidences and secrets of a client.

disqualification of the attorney when he represents an adverse interest in a related matter. *American Can Company*, 436 F.2d at 1128. Moreover, confidences imputed to the attorney are presumed shared among his partners and employees associated with him at that time. *Fred Weber, Inc.*, 566 F.2d at 608; *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 89 (5th Cir. 1976). Thus, the "liability to disqualification" extends to the attorney's partners and employees, including " 'employee' lawyers," and is not cured by dissolution of, or departure from, the partnership. *American Can Company*, 436 F.2d at 1128–29; *Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp.*, 216 F.2d 920, 927 (2nd Cir. 1954).

*Silver Chrysler, Inc., supra*, involved Chrysler's motion to disqualify an attorney previously associated, as a recent law school graduate, with a large (30 partners, 50 associates) New York law firm. The attorney's relationship with Chrysler was not "co-extensive with that of his firm," 518 F.2d at 756, and Chrysler was "in a position . . conclusively to refute [the attorney's] position that his role [in his firm's representation of Chrysler] had been non-existent or fleeting." *Id.* at 757. The State points to the Second Circuit's indication, *id.* at 754, that the inference of shared confidences is rebuttable, as mandating reversal of Griffin's disqualification. We disagree.

Canon 4, admonishing the lawyer to preserve the confidences and secrets of his clients, is inextricably wedded to Canon 9.[3] Although the *Silver Chrysler* rule may satisfy the cold letter of Canon 4 in a particular case, its universal application could violate the spirit of Canon 9. We are aware of the potential for abuse of disqualification considerations, and of the burdens created by Canons 4 and 9 on lawyers and law firms when a lawyer transfers his association from one firm to another.[4] Facts sub-

mitted to rebut the existence of actual conflict, in an effort to escape the impact of Canon 4, would not in every case assure escape from the impact of Canon 9, where the non-existence of actual conflict is presumed. .

In all events, it is not necessary for us here to reach the broad question of whether the presumption may under some circumstances be rebuttable. The appropriate question, phrased to fit the present facts, reads: "would a member of the public, or of the bar, see an 'impropriety' in the representation of C against B by a lawyer whose former small law firm represented B in a related matter and who worked to some extent on that matter?" *Cf. Fred Weber, Inc.*, 566 F.2d at 609. The question impels its own affirmative answer.

No set of canons are needed to establish the proposition that one offering services as a counselor must, if he would counsel well, receive full disclosure from the counseled. Indeed, a counselor at law is enjoined to probe deeply for all the facts, favorable and unfavorable, before counseling a particular course for his client. At the same time, the counseled must be assured that his confidential disclosures will be maintained in confidence. Society has ordained and for centuries honored the privilege against disclosure, to reassure the people that their secrets were safe in the hands of their lawyers.

Clients who retain, are billed by, and pay a law firm, can reasonably expect, and often their problems require, that confidences disclosed to one lawyer in the firm will be shared with others in the firm. Indeed, the ability to bring various fields of expertise to bear on the client's problem often serves as a justification for practice as a firm and the very reason for the client's decision to retain the firm. If the reputation and status of the legal profession, and more importantly the freedom and opportunity of the pub-

---

**3.** Canon 9. A lawyer should avoid even the appearance of professional impropriety.

**4.** We are also aware of regional differences in public outlook, in law firm numbers, sizes, variances, and degrees of specialization, and in the frequency of lawyer transfer among firms. Rarely, if ever, however, could a standard of professional ethics be applied differently in different regions in view of those facts.

lic to obtain adequate legal counseling, are to be preserved, a client must have every reason to expect that disclosures to "his" law firm will not be used against him by any member or associate lawyer in that firm.

It is precisely to protect that "expectation" of safety in disclosure that Canon 9's concern for the appearance of impropriety must be merged with Canon 4's injunction against disclosure of a client's secrets. As recognized in *Fred Weber, Inc.*, 566 F.2d at 609, considerations of actual impropriety are irrelevant to the applications of Canon 9. Hence, Griffin's ignorance of Dean's secrets, and a resulting absence of potential for their actual use against Dean, must be presumed before Canon 9 comes into play. The public cannot be expected to know of Griffin's actual knowledge.[5] It deals in images and appearances. Though a lawyer cannot be expected to be "Holier than the Pope," his conduct must be such as to breed at least the confidence normally reposed in the parish priest.

■ The district court was therefore correct that Griffin, as an " 'employee' lawyer" of the McHaney firm, is presumed to have shared confidential information, and must be disqualified. *American Can Company*, 436 F.2d at 1128–29. Whether Griffin did in fact receive confidential information is irrelevant, the policy considerations of the Code precluding that inquiry. *Fred Weber, Inc.*, 566 F.2d at 608; *Emle Industries, Inc.*, 478 F.2d at 571.

4. Denial of the motion to disqualify Griffin's staff constituted an abuse of discretion.[6]

■ Dean bases its argument for disqualification of Griffin's staff on Canon 4 and the so-called "single imputation theory" arising therefrom. *See Attorney's Conflict of Interest: Representation of Interest Adverse to that of Former Client*, 55 B.U.L. Rev. 61, 70–71 (1975) (hereinafter *Note*). This court referred to imputation in *Fred Weber, Inc.*, 566 F.2d at 608: "The attorney-client relationship raises an irrefutable presumption that confidences were disclosed. Further, the presumed access of a partner to confidential information results in imputation of that information to others in his firm. [Citations omitted.]" Dean also cites the portion of ABA Code of Professional Responsibility EC 4–5 stating: "[A] lawyer should be diligent in his efforts to prevent the misuse of [confidential] information by his employees and associates. [Footnotes omitted.]" [7]

On the present facts, Canon 4 and its accompanying Ethical Considerations are inapplicable to the challenged staff members. Griffin's disqualification rests on imputation to him of knowledge disclosed by Dean to the McHaney firm partners, the district court having specifically found that Griffin had never looked at the Buckingham file and had no knowledge of its contents while associated with the McHaney firm.[8] Disqualification of the staff under

---

5. That the public may never learn anything of this case, or of hundreds of other situations involving the ethics of the legal profession, is also irrelevant. One or two appearances of ethical blindness, as recent events illustrate, are sufficient to tar the entire profession. That phenomenon is not an unmixed evil, however. It can serve on the side of the angels in encouraging right choices of lawyer conduct and in strengthening the resolve of those working in the vineyard of professional ethics.

6. The district court gave no reasons for excluding Griffin's staff from the disqualification order. We decline to remand for findings thereon in view of the need for judicial economy, the absence of dispute on the facts, and our application of Canon 9.

7. Because of the absence of an attorney-client relationship between Griffin's staff and Dean, disqualification under Canon 4 would have to be based on the employer-employee or associate relationship between Griffin and his staff. EC 4–5; *Fred Weber, Inc.*, 566 F.2d at 607–08; *American Can Company*, 436 F.2d at 1129.

8. Dean alleges on appeal that that finding was erroneous, being based on an impermissible inquiry into Griffin's actual knowledge. What is prohibited are inquiries into the nature and extent of the information per se, *e. g.*, to determine whether use of information actually received would harm the former client. *Emle Industries, Inc.*, 478 F.2d at 571; *T. C. Theatre Corp.*, 113 F.Supp. at 268–69. Inquiry into an attorney's actual knowledge is impermissible in

Canon 4 would thus require a "double impu-· tation" first from the McHaney firm partners to Griffin, and then from Griffin to his staff. Doubling up on the imputation theory of Canon 4 in this case would be logically unjustifiable—Griffin could not impart knowledge he did not have. It would also be ethically unjustifiable, requiring the invention of actual conflict where none exists. *See Note* at 70–71 n. 51; *cf. American Can Company, supra* (knowledge imputed to attorney from his partner would not be reimputed from attorney to his co-counsel).

Despite the inapplicability of Canon 4, those members of Griffin's staff actively involved in the present suit must be disqualified,[9] because of Canon 9's injunction against "the appearance of impropriety."

We think a member of the public or of the bar would see an impropriety in the continued representation of C against B by staff lawyers whose supervisor had been disqualified because his former firm represented B in a related suit. The public perceives, a client has the right to expect, and the goals of the Code require us to assume, that the members and staff of a law firm[10] working on a suit do so collectively rather than individually. It is to be expected, therefore, that a lawyer having earlier received confidential information, could at least inadvertently[11] direct his staff to pro-

ceed along lines dictated or influenced by that information.

For Griffin's challenged staff to go on representing the State against Dean, while Griffin is disqualified from the case for past representation of Dean, therefore appears improper. *See Consolidated Theatres, Inc., supra.* The continuing participation of Griffin's staff may or may not in itself constitute an impropriety, the district court having found that Griffin had no knowledge of the Buckingham file and having at the same time noted the small size of the McHaney firm. As above indicated, however, the public and bar deal in images and broad events, not in court findings. An appearance of impropriety thus arises from the general public and bar understanding and expectation that general discussions of firm business is the norm in small law firms, as the district court recognized, and a public and bar concern for the ability of a supervising lawyer to refrain from giving his staff directions based on confidential information he had earlier obtained.

5. The denial of Dean's motion to disqualify the Susman and Specter firms was not an abuse of discretion.

■ Because the Susman and Specter firms had no attorney-client relationship with Dean, and had no employee or partnership relationship with Griffin,[12] they are not

---

the sense that it is irrelevant to disqualification *under Canon 4. In re Yarn Processing*, 530 F.2d at 89. In any event, the district court made its finding that Griffin had no actual knowledge of the Buckingham file before the court examined its contents. Memorandum Opinion at 2–3.

9. Neither Dean's motion, nor its memorandum in support, called for disqualification of named members of Griffin's staff. Or appeal, Dean has singled out the three members (Nevrla, Black, and Carfagno) actively involved in the suit (Carfagno has since left the employ of the Attorney General's Office). We reach and express no conclusion respecting the staff members other than Nevrla and Black.

Dean informed the district court that it has no objection to participation in the suit by new staff members assigned by the recently elected Attorney General.

10. No practical reason exists for differentiating, with respect to disqualification, between a

private firm and a group of attorneys and staff members of a state Attorney General's Office actively involved in a particular suit. *See Note* at 71–72, 77–78. Though a state would appear to have a special interest in and responsibility for compliance with ethical standards by all lawyers it licenses, we have not taken that interest and responsibility into account here. Nor have we considered what may be a state's greater ease of assigning counsel.

11. It is not necessary to presume that Griffin, or any lawyer, would intentionally employ a confidence against a client of his former firm. Nor is it possible to forestall surreptitious disclosure, if there be a lawyer so inclined and not involved in a case to which a client of his former firm is a party. Hence the imperatives of Canon 9.

12. The Susman and Specter firms were retained by the State as outside counsel. They are not part of the State's legal staff. Contrary

subject to disqualification under Canon 4. *Fred Weber, Inc.,* 566 F.2d at 607–08; *American Can Company,* 436 F.2d at 1129. If the co-counsel firms were to be disqualified in this case, basis would have to be found in Canon 9's injunction against the "appearance of impropriety." *Fred Weber, Inc.,* 566 F.2d at 609.[13]

Without more, we do not think a member of the public or of the bar would see an apparent impropriety in the continued representation of C against B by a lawyer whose co-counsel had been disqualified early on in the case, solely because the disqualified co-counsel's former firm represented B in a related suit. The normal public and professional perception of co-counsel envisions two or more attorneys or firms working together in a particular case while continuing to retain their individual identities and institutional independence. The same appearance of impropriety present when an attorney and his firm represent conflicting interests, and when a disqualified former lawyer's staff members continue in a case after his disqualification, is not present in the mere act of a disqualified lawyer's co-counsel continuing in the case after his co-counsel's disqualification. *Fred Weber, Inc.* 566 F.2d at 609.

Whether another appearance of impropriety might arise from continuation of co-counsel under other circumstances is not the question here. In the present case, where the district court determined that Griffin had no actual knowledge of confidential disclosures and the case is in its early discovery stages, continued presence of co-counsel in the case does not raise an appearance of impropriety sufficient to require disqualification of the Susman and Specter firms.

### Conclusion

The district court's finding of a substantial relationship was not clearly erroneous. Neither its disqualification of Griffin nor its refusal to disqualify the Susman and Specter firms constituted an abuse of discretion. In view of Canon 9, an abuse of discretion occurred in the refusal to disqualify Nevrla and Black of Griffin's staff. Accordingly, the order of the district court is affirmed in part and reversed in part.

to Dean's assertion at oral argument, they are not employees of Griffin or his Antitrust Division as that term is used in the cases, the former Canons, or the present Code. Nor are they partners or associates as those terms are there used. *American Can Company* at 1129.

**13.** *Fund of Funds, Limited v. Arthur Andersen & Co.,* 567 F.2d 225 (2nd Cir. 1977), cited by Dean, is distinguishable. There, the Morgan Lewis firm had represented Andersen and Fund of Funds (FOF) in unrelated matters, and agreed to represent FOF in an action ultimately involving Andersen. When the conflict became apparent, Morgan Lewis retained Meister and the Milgrim firm as co-counsel. Meister, the Milgrim firm, and Morgan Lewis had maintained a close working relationship and had been co-counsel in two prior cases involving

FOF. On those facts, the court said, *id.* at 235 (footnotes omitted):

[W]e have never believed that labels alone—partner, clerk, co-counsel—should control our decisions in so sensitive an area. Here, where Meister worked closely with Morgan Lewis not only in *King* (a related case) but in *SEC v. Vesco,* an appearance of impropriety arises from this close association. Further, given the extraordinary, *sui generis* facts underlying this action, the generally stated rule that a "co-counsel" relationship will not alone warrant disqualification is of little relevance to this case. *See Consolidated Theatres, Inc. v. Warner Bros. Cir. Man. Corp., supra; Akerly v. Red Barn System, Inc.,* 551 F.2d 539 (3d Cir. 1977); *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125 (5th Cir. 1971).