**ENGINEERED PRODUCTS CO., Plaintiff,**

v.

**DONALDSON COMPANY, INC., Defendant.**

No. C98–2106–MWB.

United States District Court, N.D. Iowa, Eastern Division.

Nov. 14, 2003.

Bridget A. Sullivan, Craig J. Lervick, Edward M. Laine, Oppenheimer Wolff & Donnelly, Minneapolis, MN, Richard S. Fry, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Plaintiff.

Annamarie A. Daley, Christopher J. Sorenson, Robert J. Tansey, Jr., Robins, Kaplan, Miller, Ciresi, Minneapolis, MN, Stephen J. Holtman, Simmons, Perrine, Albright, Ellwood, Cedar Rapids, IA, for Defendant.

### ORDER

ZOSS, United States Magistrate Judge.

## I.  INTRODUCTION

This is a patent infringement case that was filed in this court on November 20, 1998.  Trial is scheduled to commence before the Honorable Mark W. Bennett on February 2, 2004.

On October 16, 2003, the plaintiff Engineered Products Co. (EPC) filed a motion for qualification of counsel, a supporting memorandum, and a request for oral argument.  (Doc. No. 219) In the motion, EPC asks the court to make a determination that attorney Alan Carlson ("Carlson") and the law firm of Carlson, Caspers, Vandenburgh & Lindquist, P.A. (CCVL) should not be precluded from representing EPC in this lawsuit because of a conflict of interest.  On October 21, 2003, the court entered an order granting the request for oral argument.  (Doc. No. 221)

On October 30, 2003, the defendant Donaldson Company, Inc. (Donaldson) filed a motion to revoke the *pro hac vice* admissions of Carlson and J. Derek Vandenburgh into the bar of this court, together

with a supporting memorandum.[1] (Doc. No. 223) In the motion, Donaldson asks the court to prohibit Carlson and CCVL from representing EPC in this case because of a conflict of interest and the appearance of impropriety. Donaldson also asks the court to strike certain of the materials submitted by EPC in support of its motion for qualification of counsel.[2] Also on October 30, 2003, Donaldson filed a motion for leave to file an *in camera* statement of facts (Doc. No. 224), which the court granted on November 3, 2003 (Doc. No. 227). On October 31, 2003, Donaldson filed a memorandum in opposition to EPC's motion for qualification of counsel. On November 6, 2003, EPC filed a reply brief (Doc. No. 232), and a brief in opposition to Donaldson's motion (Doc. No. 233).

The court heard arguments on the motions on November 7, 2003. Carlson and Vandenburgh appeared for EPC. Annamarie A. Daley and Amy Becker appeared for Donaldson. Both parties have sent post-hearing submissions to the court. The court now considers the motions to be fully submitted.

## II. FACTUAL BACKGROUND AND THE PARTIES' CONTENTIONS

Former District Judge, now Circuit Judge, Michael Melloy described this case as follows: "In this patent infringement action, [EPC] asserts patent and trade dress claims against [Donaldson] arising from Donaldson's creation and sale of two air filter indicator devices—the Air Alert, sold from 1997 to 1999, and the NG Air Alert, sold from 1999 through the present." *Engineered Prods. Co. v. Donaldson Co.*, 165 F.Supp.2d 836, 841 (N.D.Iowa 2001).

Agio Capital Partners I, L.P. (Agio), a Minnesota company, owns a majority interest in EPC. After it became apparent that the present case would proceed to trial before a jury, Agio became concerned about the experience and qualifications of the attorneys representing EPC in the litigation. In September 2003, Agio retained Alan J. Wilensky, a Minneapolis attorney, to recommend a patent trial lawyer from the Minneapolis area to take over the trial of the case. After inquiring about intellectual property trial lawyers in Minneapolis, Wilensky decided Agio should retain Carlson to represent EPC in the case.

During the initial meeting between Carlson and Wilensky, Carlson advised that he had performed legal work for Donaldson in the past, and he expected Donaldson might raise an objection to his appearing in the case. From 1971 until January 2003, Carlson had been an attorney with the Minneapolis law firm of Merchant & Gold (M & G). For many years, M & G had provided intellectual property legal services to Donaldson, and was continuing to perform those services when Carlson left M & G. Carlson personally had performed a significant part of that work, including the handling of several patent cases, two of which had gone to trial. Carlson last represented Donaldson in early 1997, when he believes he was "fired" by Donaldson.[3] M &

---

1. Carlson and Vandenburgh filed separate motions for leave to appear *pro hac vice* on October 16, 2003 (Doc. Nos. 217 & 218), and the motions were granted by the Clerk of Court on October 17, 2003 (Doc. No. 220). Because such motions seldom are resisted, the ordinary practice of the Clerk of Court is to grant the motions as a matter of course without a waiting a resistance. In this case, the defendant objects vigorously to the admissions. The court will place no weight on the

fact that the Clerk of Court granted the *pro hac vice* motions in addressing the issues currently before the court.

2. The motion to strike is **denied**. The court will give the appropriate weight, if any, to the materials submitted by EPC.

3. The parties dispute whether Carlson actually was fired from representing Donaldson, but they agree that after early 1997, at Donald-

G continued to represent Donaldson on numerous matters, including patent disputes. Carlson was CEO and chairman of the board of M & G from 1989 until 1996, and remained on the board until he left the firm in January 2003, to found CCVL.

Before agreeing to take this case, Carlson learned Donaldson objected to his representation of EPC in this lawsuit based on a claim of conflict. Carlson sought counsel from an "expert" in Minnesota legal ethics. Both Carlson and the expert decided there was no conflict. EPC decided to retain Carlson to appear on its behalf in the lawsuit.

The parties have markedly different views of the nature and extent of the prior representation Carlson provided to Donaldson. According to EPC, Paul Welter at M & G was the primary attorney for Donaldson. Welter and several other attorneys at M & G represented Donaldson on day-to-day matters, including the obtaining of patents. Carlson was a patent trial attorney at M & G. Beginning in the 1980s, he represented Donaldson in a number of patent cases. Two of those cases went to trial, the last one being a case filed against Donaldson by Nelson Industries. Carlson tried the Nelson Industries case in 1994, and Donaldson lost. Carlson continued to represent Donaldson on the matter until the case was settled in early 1997. After the settlement, Donaldson no longer used Carlson's legal services, and Carlson had no further involvement in Donaldson matters. In fact, Carlson believes he was "locked out" of all Donaldson matters at the law firm. According to Carlson, he did not even know the present lawsuit had been filed until he met with Wilensky in September 2003.

Carlson states that after meeting with Wilensky, the following occurred:

In order to familiarize myself with the case, I read the summary judgment decision, as well as some of the briefs filed with the court in support of the motions. I learned that this case relates to a patent owned by EPC for a gauge to measure filter life. I did not know that Donaldson had such a product. I did not work on such a Donaldson product, and that product is different than the products that were at issue in any of the prior matters that I recall working on for Donaldson. No one with CCVL was aware of the Donaldson dispute with EPC.

(Doc. No. 219–4, Declaration of Alan G. Carlson, ¶ 18)

Carlson denies any involvement in the creation of strategies or polices for dealing with patent matters at Donaldson. He states, "Donaldson had no general strategies or policies or philosophies regarding the handling of patent disputes. At the time I litigated patent matters for Donaldson, the only strategy ever employed in the litigation was strategy I created to deal with the specific facts of each case to respond to the opponent's position." (Id., ¶ 14.)

Donaldson, on the other hand, describes a more intimate relationship between the company and Carlson. According to Donaldson, Carlson was one of the primary attorneys from M & G providing legal representation to Donaldson. From 1989 to 1997, Carlson worked on at least 25 different intellectual property files for Donaldson, and was the attorney at M & G in charge of Donaldson's litigation matters assigned to the firm. Donaldson claims Carlson provided broad representation to Donaldson on patent matters, including working on patent applications, infringement opinions, and negotiations with competitors. Donaldson claims Carlson also

son's request, Carlson performed no further    work on any Donaldson files.

was involved with developing and presenting training materials regarding intellectual property matters at Donaldson.

According to Robert Findorff, General Manager of Donaldson's Engine Group:[4]

> Alan Carlson was provided with significant confidential information about Donaldson [and] its business strategies and philosophies. He assisted Donaldson in developing intellectual property approaches and strategies on a global basis. Our management provided him with information about critical aspects of our organization and our decision-making processes. [Carlson] was provided with confidential information about Donaldson's product strategies. He was provided with Donaldson's information about communications with competitors and actually wrote a number of letters on behalf of Donaldson to various competitors about patent matters.

(Doc. No. 225–5, Declaration of Robert Findorff, ¶ 6) Norm Linnell, general counsel for Donaldson since July 29, 1996, states he "conveyed confidential Donaldson information to [Carlson] regarding [Donaldson's] intellectual property litigation strategies and, in particular, regarding the business of Donaldson's Engine Group." (Doc. No. 225–1, Declaration of Norm Linnell, ¶ 6)

Donaldson asserts that at least three witnesses listed by the parties in the present case were called by Carlson as witnesses in his earlier trials for Donaldson. Two of these witnesses have signed declarations stating that while meeting with Carlson to prepare for testifying in the earlier cases, they provided Carlson with confidential information, including information about other intellectual property matters at Donaldson. They assert some of this confidential information would be relevant to the issues in the present case.

Donaldson points out that even after Carlson stopped working on M & G files in January 1997, his name remained on different billing account records at M & G related to Donaldson matters. Donaldson also alleges Carlson participated in promotional lunches with Donaldson representatives in 1996 and 1997. Donaldson claims Carlson had a close relationship with Dick Carlson (no relation), who was Donaldson's contact person for Carlson until Dick Carlson left Donaldson to take a position at another company, ADC Telecommunications. CCVL currently represents ADC Telecommunications. Dick Carlson is listed as a witness in the present case. Donaldson also asserts that several attorneys at CCVL were listed as attorneys on powers of attorney Donaldson executed for the patent applications which M & G filed for the patent at issue in the present case.

In November 1998, when EPC commenced the present lawsuit, and thereafter, representatives of Donaldson worked on the case with various lawyers at M & G in connection with the case.[5] At least four M & G attorneys have worked on this case, with billings on the file totaling in excess of $30,000. (Doc. No. 225–3, Declaration of Charles Golla, ¶ 5; *in camera* materials submitted by Donaldson.)

### III. FINDINGS OF FACT

From the record, the court finds the following facts. From 1989 to 1996, Carl-

---

**4.** Donaldson's Engine Group was the division responsible for the products at issue in both the Nelson lawsuit and the present lawsuit.

**5.** There is no claim that Carlson or any other lawyer at CCVL ever performed any work for Donaldson on this case. Carlson states he was unaware that M & G had worked on this case until he reviewed the submissions filed by Donaldson in connection with the motions presently before the court.

son was the CEO and chairman of the board of M & G, a large Minneapolis law firm. After 1996, Carlson remained on the board until early 1997, when he left the firm to establish a new law firm, CCVL. While at M & G, Carlson was one of the firm's principal trial attorneys, primarily trying cases involving intellectual property, including patents.

Beginning in the 1980s, Carlson represented Donaldson on numerous matters, which included work on over 25 intellectual property files. Carlson also was Donaldson's chief trial attorney on two patent trials. The second of these two trials, which took place in 1994, resulted in an outcome unfavorable to Donaldson. When the case was concluded in early 1997, Donaldson and M & G agreed that Carlson would not work on any further Donaldson matters. Thereafter, neither Carlson nor any of the attorneys who followed Carlson to CCVL had any involvement in any Donaldson matters.

Beginning in late 1998, Donaldson began consulting with M & G attorneys about the present case, but Carlson was not consulted, and he knew nothing about the case until he was contacted to represent EPC in September 2003, nearly six years after his last involvement with any Donaldson matter. Donaldson hired another law firm to appear on its behalf in this lawsuit.

Donaldson asserts Carlson was involved in developing strategies and policies at the company, and his knowledge of these confidential matters would give him an unfair advantage if he were permitted to represent EPC in the present lawsuit. This assertion is supported by several conclusory, non-specific declarations by Donaldson employees. The court gives these declarations little weight. Carlson specifically denies any involvement in such matters, and the general nature of the claimed confidences provides the court with nothing to evaluate.

Donaldson argues at length that Carlson's relationship with its former employee, Dick Carlson, somehow establishes that Carlson should not be permitted to represent EPC in this case. Carlson responds that prior to being contacted by EPC in September 2003, he had spoken with Dick Carlson only once in the preceding four or five years. The court sees little, if any, significance to this matter.

Donaldson further argues that because some of the witnesses in the present case, including Dick Carlson, were witnesses in one of the two cases Carlson tried for Donaldson, Carlson should be conflicted out of trying the EPC case. Again, the court gives this assertion little weight. Similarly, the court does not find it significant that M & G did not change its Donaldson billing records to remove Carlson's name after he no longer was being used by Donaldson, or that six or seven years ago, Carlson may have had "promotional" lunches with Donaldson employees.

Donaldson's "smoking gun" is a videotape of an in-house presentation given by Carlson to Donaldson employees in 1994. This videotape was submitted to the court for *in camera* review, but the court is uncertain as to why. The presentation is a generic, nuts-and-bolts overview of intellectual property law and how a company can protect its trade secrets. The information Carlson provided was of the type commonly presented at general practice seminars. Although Donaldson employees asked a few product-specific questions at the seminar, Carlson's responses consisted of general information applicable to any company learning how to protect its intellectual property. The fact that this videotape was submitted to the court as supposedly strong evidence of a conflict causes the court to doubt the genuineness of Donaldson's other unsubstantiated assertions.

## IV. LEGAL ANALYSIS

The decision whether to grant or deny a motion to disqualify an attorney rests in the sound discretion of the court. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1154 (8th Cir.1999) Because of the potential for abuse by opposing counsel, disqualification motions should be subjected to particularly strict judicial scrutiny. *Harker v. Comm'r*, 82 F.3d 806, 808 (8th Cir. 1996); *see Midwest Motor Sports v. Arctic Sales, Inc.*, 347 F.3d 693, 700–01 (8th Cir. 2003). " 'Doubts should be resolved in favor of disqualification,' *Griffen by Freeland v. East Prairie, Missouri Reorg. Sch. Dist. No. 2*, 945 F.Supp. 1251, 1253 (E.D.Mo.1996) (Perry, J.), but it is the burden of the party arguing for disqualification to demonstrate clearly that 'continuing representation would be impermissible.' *Shade v. Great Lakes Dredge & Dock Co.*, 72 F.Supp.2d 518, 520 (E.D.Pa. 1999)." *Goss Graphics Systems, Inc. v. Man Roland Druckmaschinein Aktiengesellschaft*, 2000 WL 34031492, at *4 (N.D.Iowa May 25, 2000) (Melloy, J.); *see also U.S. v. Johnson*, 131 F.Supp.2d 1088, 1093–94 (N.D.Iowa 2001) (Bennett, J.)

In ruling on a motion to disqualify counsel, the court must look to both Iowa law and the ethical rules announced by the national legal profession. *Goss Graphics Systems, supra*, at *5 (citing *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir.1992)). While local rules and state standards are relevant, motions to disqualify are substantive motions affecting the rights of the parties, and are to be determined applying standards developed under federal law. *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir.1992).

"In general, an attorney must be disqualified from representing a party against a former client if the two representations bear a 'substantial relationship' to each other." *Doe v. Perry Cmty. School Dist.*, 650 N.W.2d 594, 597 (Iowa 2002) (citing *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Walters*, 603 N.W.2d 772, 777 (Iowa 1999)); *accord Sorci v. Iowa Dist. Ct. for Polk County*, 671 N.W.2d 482, 493–94 (Iowa 2003). Confidential disclosures, actual or presumed, necessitate disqualification of the attorney when the attorney represents an adverse interest in a related matter. Moreover, confidences imputed to the attorney are presumed to be shared among the partners and employees associated with the attorney at that time. *Goodlett v. The Paul Revere Life Ins. Co.*, 2000 WL 34027916, *4 (N.D.Iowa Jan. 15, 2000) (Jarvey, J.)

The leading case in the Eighth Circuit on this subject is *State of Arkansas v. Dean Foods Products Co.*, 605 F.2d 380 (8th Cir.1979) ("*Dean Foods*"), *overruled on other grounds, In re Multi–Piece Rim Products Liability Litigation*, 612 F.2d 377 (8th Cir.1980). (overruled on the issue of the appealability of attorney disqualification orders). In *Dean Foods*, the court rejected any "bright line" rules, holding as follows:

> Disqualification of counsel, like other reaches for perfection, is tempered by a need to balance a variety of competing considerations and complex concepts. Disqualification in spasm reaction to every situation capable of appearing improper to the jaundiced cynic is as goal-defeating as failure to disqualify in blind disregard of flagrant conflicts of interest. Between those ethical extremes lie less obvious influences on the interest of society in the orderly administration of justice, on the interest of clients in candid consultation and choice of counsel, and on the interest of the legal profession in its reputational soul. So too, the judicial effort to light a disqualification path is unlikely to result in an early formulation of rules universally applicable to the Canons of the Code of Profes-

sional Responsibility. Rigid rules can be sterile and lacking in universal application. At the same time, an "every case on its own facts" approach can be facile and unhelpful. Ethical experience is the key. Until more is gained, rigidity may be feasible at the far ends of the ethics spectrum, while flexibility governed by facts must reign in a gradually diminishing area between those extremes.

*Dean Foods,* 605 F.2d at 383; *see Steele v. Lacey,* 1997 WL 138974, at *3 (D.Neb. Mar. 26, 1997).

The court in *Dean Foods* relied on the ABA's *Model Code of Professional Responsibility* (the "Model Code"), upon which the *Iowa Code of Professional Responsibility for Lawyers* (the "Iowa CPRL") is based. *See In re Citation of C.A. Frerichs,* 238 N.W.2d 764, 769 (Iowa 1976) (noting the Iowa CPRL "is derived from the ABA Code"). The Iowa CPRL applies to the conduct of the legal profession in this court. *See* Local Rule 83.2(g)(1).[6] With respect to attorneys appearing *pro hac vice,* Local Rule 83.2(d)(2) provides as follows:

> An attorney who is not a member of the bar of the district may be admitted to practice in a particular case pro hac vice by filing a motion asking to be admitted pro hac vice. By asking to be admitted pro hac vice, the attorney agrees that in connection with the attorney's pro hac vice representation, the attorney will submit to and comply with all provisions and requirements of the Iowa Code of Professional Responsibility for Lawyers, or any successor code adopted by the Iowa Supreme Court.

Carlson and Vandenburgh both filed motions for admission *pro hac vice* to this court, stating they agreed to "submit to and comply with all provisions and requirements of the rules of conduct applicable to attorneys admitted to practice before the state courts of Iowa in connection with [their] pro hac vice representation in this case." (Doc. Nos. 217 & 218)

The following provisions of the Iowa CPRL arguably have some relevance to the issues presented to the court in this case:

> CANON 1. A LAWYER SHOULD ASSIST IN MAINTAINING THE INTEGRITY AND COMPETENCE OF THE LEGAL PROFESSION.
>
> . . .
>
> EC 1–5: A lawyer should maintain high standards of professional conduct and should encourage other lawyers to do likewise. . . . To lawyers especially, respect for the law should be more than a platitude.

> CANON 4. A LAWYER SHOULD PRESERVE THE CONFIDENCES AND SECRETS OF A CLIENT.
>
> EC 4–1: Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require lawyers to preserve the confidences and secrets of those who employ or seek to employ them. Clients must feel free to discuss whatever they wish with their lawyer and lawyers must be equally free to obtain information beyond that volunteered by their clients. A lawyer should be fully informed of all the facts of the matter being handled in order for the client to obtain the full advantage of our legal system. It is for the lawyer in the exercise of independent professional judgment to sep-

---

**6.** Local Rule 83.2(g)(1) provides, in pertinent part, "The rules of conduct applicable to attorneys admitted to practice before the state courts of Iowa govern all members of the bar of this court and, to the extent provided in

arate the relevant and important from the irrelevant and unimportant. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of a client not only facilitates the full development of facts essential to proper representation of the client but also encourages laypersons to seek early legal assistance. . . .

EC 4–5: A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client . . . . Care should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to another, and no employment should be accepted that might require such disclosure.

EC 4–6: The obligation of a lawyer to preserve the confidences and secrets of a client continues after the termination of employment. . . .

DR 4–101: Preservation of Confidences and Secrets of a Client.

(A) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

(B) . . . [A] lawyer shall not knowingly:

(1) Reveal a confidence or secret of a client.

(2) Use a confidence or secret of a client to the disadvantage of the client.

(3) Use a confidence or secret of a client for the advantage of the law-

yer or of a third person, unless the client consents after full disclosure.

CANON 5. A LAWYER SHOULD EXERCISE INDEPENDENT PROFESSIONAL JUDGMENT ON BEHALF OF A CLIENT.

EC 5–1: The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of the client and free of compromising influences and loyalties. Neither personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute a lawyer's loyalty to a client.

EC 5–14: Maintaining the independence of professional judgment required of a lawyer precludes the acceptance or continuation of employment that will adversely affect the lawyer's judgment on behalf of, or loyalty to, a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant.

EC 5–15: If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, the lawyer must weigh carefully the possibility that the lawyer's judgment may be impaired or loyalty divided if the employment is accepted or continued. The lawyer should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which a lawyer would be justified in representing in litigation

subsection (d)(2) of this rule, those admitted       pro hac vice.''

multiple clients with potentially differing interests. . . .

. . .

EC 5–19: A lawyer may represent several clients whose interests are not actually or potentially differing. Nevertheless, the lawyer should explain any circumstances that might cause a client to question the lawyer's undivided loyalty. Regardless of the lawyer's belief that multiple clients may be properly represented, the lawyer must defer to a client who holds the contrary belief and withdraw from representation of that client.

. . .

DR 5–105. Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

. . .

(C) A lawyer shall not continue multiple employment if the exercise of independent professional judgment on behalf of a client will be or is likely to be adversely affected by the representation of another client[.] . . .

CANON 9. A LAWYER SHOULD AVOID EVEN THE APPEARANCE OF PROFESSIONAL IMPROPRIETY.

. . .

EC 9–6: Every lawyer owes a solemn duty to uphold the integrity and honor of the profession; to encourage respect for the law and for the courts and the judges thereof; to observe the Code of Professional Responsibility; to act as a member of a learned profession, one dedicated to public service; to cooperate with other lawyers in supporting the organized bar through the devotion of time, efforts, and financial support as the lawyer's professional standing and ability reasonably permit; to conduct oneself so as to reflect credit on the legal profession and to inspire the confidence, respect, and trust of clients and of the public; and to strive to avoid not only professional impropriety but also the appearance of impropriety.

Iowa CPRL, Iowa Code Ann. vol. 57J.

None of these provisions appears to answer directly the questions posed by the motions pending before this court. However, the court in *Dean Foods* relied on Canons 4 and 9 of the Model Code to address similar questions. The court noted the applicable rule was "well described in *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268–69 (S.D.N.Y.1953)," wherein the court held:

"(T)he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action (where) the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation."

*Dean Foods,* 605 F.2d at 383 (quoting *T.C. Theatre Corp., supra*); *see United States v. Shepard,* 675 F.2d 977, 980 (8th Cir. 1982) (presumption exists that an attorney receives confidential communications in the course of representing a client). The *Dean Foods* court cited Canon 4 of the Model Code ("A lawyer should preserve the confidences and secrets of a client"), and noted Canon 4 "is inextricably wedded" to Canon 9 ("A lawyer should avoid even the appearance of professional impropriety"). *Dean Foods,* 605 F.2d at 385. *See Sorci, supra,* at 493–94 (prohibition against representing a party against a former client is "based in Canon 4, but also implicates Canon 9, insofar as both canons

seek to preserve public confidence in the legal system"). The *Dean Foods* court held, "Facts submitted to rebut the existence of actual conflict, in an effort to escape the impact of Canon 4, would not in every case assure escape from the impact of Canon 9." *Dean Foods*, 605 F.2d at 385. Therefore, the court found that under the facts of the case, " 'the attorney-client relationship raises an *irrefutable* presumption that confidences were disclosed.' " *Dean Foods*, 605 F.2d at 384 (emphasis added) (quoting *Fred Weber v. Shell Oil Co.*, 566 F.2d 602, 608 (8th Cir.1977)).

In reaching this conclusion, the court distinguished *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751 (2nd Cir.1975), a case relied on here by EPC for the proposition that the presumption is a rebuttable one. The *Dean Foods* court pointed out that the attorney in *Silver Chrysler* had worked for a large law firm during his prior representation of the complaining party, while the attorney in *Dean Foods* had worked for a small law firm. The court then held that, under the facts in *Dean Foods*, the appropriate question was whether "a member of the public, or of the bar, [would] see an 'impropriety' in the representation of C against B by a lawyer whose former small law firm represented B in a related matter and who worked to some extent on that matter[.]" *Dean Foods*, 605 F.2d at 385. The court found, "The question impels its own affirmative answer." *Id.* However, the court also specifically noted it was not deciding the broader question of whether the presumption might, under some circumstances, be rebuttable. *Id.*

In the present case, unlike in *Dean Foods*, Carlson did not come from a "small law firm," but from a large firm, and he never worked on this particular matter, although the question of whether he worked on a "related matter" is hotly disputed by the parties. Because the facts in the present case arguably are distinguish-able from the facts in *Dean Foods*, that case is not necessarily controlling.

Since *Dean Foods*, the law in the Eighth Circuit has not been clarified significantly. In *EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1461 (Fed.Cir.1984), the Federal Circuit, applying Eighth Circuit law, held as follows

> The precise rule in disqualification applied in the Eighth Circuit ... is not clear [footnote omitted], but we are satisfied that Circuit would not be less solicitous of client confidentiality than the general weight of authority which is that—where a substantial relationship is found to exist between two adverse matters (and sides) in which the challenged attorney or his firm has participated and will participate—there is a presumption (in the situation of a private lawyer's 'changing sides') that confidential disclosures passed to the challenged lawyer, but that presumption is rebuttable.

*Id.* See *Cook v. City of Columbia Heights*, 945 F.Supp. 183, 186–87 (D.Minn.1996).

In *Harker v. C.I.R.*, 82 F.3d 806, 808–809 (8th Cir.1996), the court held that where the ABA's *Model Rules of Professional Conduct* (the "Model Rules") have replaced the Model Code, the presumption is rebuttable because the Model Rules do not incorporate the "appearance of impropriety" standard from Canon 9 of the Model Code. Notably, in Iowa, the Model Rules have not replaced the Model Code, although the *Iowa Rules of Professional Conduct* Drafting Committee has recommended the adoption of new rules based on the Model Rules.

EPC cites a number of decisions from other jurisdictions where the presumption has been held to be rebuttable. *See, e.g., Laker Airways Ltd. v. Pan Am. World Airways*, 103 F.R.D. 22, 31 (D.D.C.1984); *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 723 (7th Cir.1982); *Sil-*

*ver Chrysler, supra.* None of these decisions involves the application of Eighth Circuit law.

Donaldson cites *Hallmark Cards, Inc. v. Hallmark Dodge, Inc.,* 616 F.Supp. 516 (W.D.Mo.1985), a case that is similar in many respects to the present case. In *Hallmark,* the district court applied Eighth Circuit law and disqualified an attorney based on the application of Canons 5 ("[A] lawyer should exercise independent professional judgment on behalf of a client") and 9. Donaldson also cites *Cameron Iron Works, Inc. v. Hydril Co.,* 208 U.S.P.Q. 672, 1980 WL 30294 (S.D.Tex. 1980), where the court reached the same result applying Fifth Circuit law. *See also Perry Cmty. School Dist.,* 650 N.W.2d at 599 (relying on EC 9–2, the court held, "Because of the strong appearance of impropriety, once we conclude a substantial relationship exists between the two representations, disqualification cannot be avoided.").

There is no question that all of the lawyers employed by M & G while the firm was representing Donaldson in connection with the present case are presumed to have knowledge of confidential communications between Donaldson and M & G concerning the case. Thus, the court must presume Carlson, and the lawyers who followed him from M & G to CCVL, have knowledge of confidential communications concerning this case. Also, if Carlson ever represented Donaldson on any matter "substantially related" to the present case, the court must presume he has knowledge of confidential communications between Donaldson and M & G regarding the case. The question is whether, under the facts of this case and the applicable law, these presumptions are rebuttable. If they are not, then Carlson and CCVL must be disqualified. If they are rebuttable, then the court must analyze whether, on this record, EPC has rebutted both of these pre-

sumptions sufficiently to avoid disqualification from the case.

■ Under the facts of this case, and taking into account the current state of the law in Iowa and the Eighth Circuit on the issue, the court finds the presumption is not rebuttable, and Carlson and CCVL are presumed to have knowledge of confidential communications between Donaldson and M & G regarding the case. However, even if the presumption were rebuttable, the court finds that on this record, Carlson has failed to rebut the presumption. While the court has no reason to doubt Carlson's representations that he knew nothing about the present case while he was at M & G, and that he was not involved in establishing policies and strategies at Donaldson, the court nevertheless finds Carlson has a conflict. Carlson was on M & G's board of directors and was one of the firm's chief trial attorneys during the period from November 20, 1998, when the present action was filed, until January 2003. M & G continued to provide representation to Donaldson throughout that time period. Further, the evidence shows that during the time Carlson was actively consulting with Donaldson, he enjoyed a significant, close relationship with Donaldson's general counsel and members of top-level management at the company, many of whom are involved in defending the present action. Among those persons was Dick Carlson, who, although no longer with Donaldson, now is associated with another of Carlson's clients. Under these facts, the "appearance of impropriety" standard embodied in the Iowa CPRL prevents Carlson from representing interests adverse to Donaldson's in this action.

## V. CONCLUSION

Based on the foregoing analysis, the motion for qualification of counsel (Doc. No. 219) is **denied,** and the motion to revoke

the *pro hac vice* admissions of Alan Carlson and J. Derek Vandenburgh (Doc. No. 223) is **granted**. The admissions of Carlson and Vandenburgh to the bar of this court, and their appearances in this action, are stricken.

A party intending to object to or seek review or reconsideration of this order must serve and file specific, written objections to the order **by December 1, 2003**. Any response to the objections must be served and filed within 5 court days after service of the objections. A party asserting such objections must arrange promptly for a transcription of the taped record of the hearing on the motions.

**IT IS SO ORDERED.**